UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LIFEWISE INC. et al., | CASE NO. 2:25-cv-02604-LK |
| Plaintiffs, | ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION |
| v. | |
| EVERETT PUBLIC SCHOOL DISTRICT et al., | |
| Defendants. | |

This matter comes before the Court on Plaintiffs' motion for a preliminary injunction. Dkt. No. 5. Plaintiff LifeWise, Inc. provides off-site religious instruction to students in the Everett Public School District. Co-Plaintiff Sarah Sweeny is a LifeWise staff member and parent whose children attend LifeWise programming.

Plaintiffs claim that certain District policies placing restrictions on various of LifeWise's functions and planned activities violate the First Amendment's Free Speech and Free Exercise Clauses. Plaintiffs seek an order requiring Defendant Everett Public School District to (1) refrain from enforcing any requirements on LifeWise that do not apply to every other organization to

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 1

whom the school releases custody of students; (2) permit LifeWise to participate in the District's community resource fairs and to display printed flyers on an online forum and in District lobbies where secular organizations are allowed to do so, including flyers that depict persons engaged in religious activities such as prayer; (3) permit Emerson Elementary School students to be released for LifeWise programs under a parental permission slip policy less onerous than what is currently in place; and (4) refrain from requiring that Ms. Sweeny's children keep religious instructional materials sealed upon returning from religious instruction. For the reasons set forth below, the Court grants the motion in part and denies it in part.

## I.    BACKGROUND

**A.    LifeWise Provides Religious Instruction to Everett Public School Students**

LifeWise is a nonprofit corporation with chapters in over 400 school districts nationwide, offering religious instruction to public school students. Dkt. No. 5-3 at 1–3. Each program follows the same general model: with parents' permission, LifeWise staff members check students out of school during the school day when non-mandatory instruction is occurring and transport them offsite for religious instruction. *Id.* at 2. LifeWise lessons emphasize "(1) knowing what the Bible says, (2) examining how a Biblical passage ties into the larger story of the Gospel, and (3) exploring practical ways that students can live out the changed character the Gospel produces." *Id.* at 2–3. The lessons include "biblical literacy and character development," including "lessons in virtues like courage, honesty, kindness, and forgiveness." Dkt. 5-1 at 1–2.

In January 2025, LifeWise began providing programming—including Bible-based lessons—to students of Emerson Elementary School in the Everett Public School District. *Id.* at 1. LifeWise provides off-site, religious instruction to Emerson students "on two different days per week, with each day dedicated to a different age group." Dkt. No. 23 at 5. This programming is known as "release time religious instruction" (or "RTRI"). Dkt. No. 5-1 at 2. LifeWise also

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 2

distributes Bibles to students that contain its own "unique teaching and editorial material" and "recap cards" to underscore and summarize the day's lessons. Dkt. No. 5-3 at 3–4, 7.

At the time this motion was filed, "more than sixty children from over forty families at Emerson Elementary participate[d] in LifeWise's programming." Dkt. No. 5-1 at 2. LifeWise does not use school resources or property for its weekly lessons. *Id.* Instead, LifeWise staff members pick up students from Emerson in a LifeWise-owned bus and transport them to and from a nearby church, where instruction occurs. *Id.* LifeWise ensures that all of its staff and volunteers pass "comprehensive background checks." *Id.* at 3.

**B.      The Permission Slip Process**

"LifeWise is not a District-sponsored club or program," and the District does not contract or partner with LifeWise. Dkt. No. 23 at 2. The District requires that a parent or guardian give permission for a student to leave campus during the school day for LifeWise instruction. *Id.* at 2. "[T]he school's responsibility is to release the student to only an authorized adult, and not to a specific organization." *Id.* at 5. Students seeking to attend LifeWise instruction proceed to the Emerson front office, and the school permits their release to LifeWise only if the District has received conforming permission. Dkt. No. 34-1 at 3.

The requirements for permission have evolved over time. When LifeWise began working with Emerson students, the District "allowed a LifeWise representative . . . to collect permission slips from each participating parent and deliver them all at once to the attendance email on the parents' behalf." *Id.* at 4. "The District also initially allowed each permission slip to authorize release of students to up to four designated individuals rather than require identification of a single individual who will be signing the student out of school." *Id.*; *see also* Dkt. No. 5-1 at 18.

In August 2025, Darcie Hammer, the Program Director of the Everett chapter of LifeWise, met with the Principal of Emerson and an Everett School District regional superintendent about

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 3

the permission slip process for the 2025–26 school year. Dkt. No. 5-1 at 8. Ms. Hammer "proposed a sample permission slip release form that parents could fill out to authorize their students to participate in LifeWise for the entire semester." *Id.* The proposed form acknowledged that the school "is not responsible for [the] students' transportation to or from the offsite course," the student "is not under the care of the Everett Public Schools" during release time, the release time instruction "is not a district sponsored activity," and the "district has no legal relationship with the sponsoring non-profit organization." *Id.* at 8–9; *see also id.* at 33. The proposed form also identified the names of five specific individuals who could receive custody of the students for the release time instruction and identified the specific dates on which the students could attend LifeWise. *Id.* at 33.

Following a September 9, 2025 school board meeting, the District imposed new attendance and check-in/check-out guidelines for LifeWise (the Release Time for Religious Instruction, or "RTRI Guidelines")." *Id.* at 9. The new RTRI Guidelines provided "guidelines for the release of a student for religious-related activities or instruction[.]" *Id.* at 36. The Guidelines state that "[p]arents and guardians have the right to choose to seek the release of their students during the school day for religious-related activities or instruction that occurs off school property for part of the school day pursuant to District Policy 2340 and Procedure 2340P." *Id.* The Guidelines require that "[a]ll requests for release of a student for any reason must come directly from the parent/guardian to the school" and not from an organization. *Id.* Release requests "must be done through either a written note or an email at each of those occurrences" and must include the student's name, the date and time of release, and "[t]he name of the adult who will pick up the student." *Id.* The section of the policy addressing frequently asked questions confirms that a request for release "need[s] to be made for each instance separately"—that is, "for each week"— and designate "release to a single person." *Id.* at 38.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 4

LifeWise states that parents can sign their children up for programming with other third-party organizations "like 'Strategic Kids' (a STEM-education organization that operates a LEGO Club after school) and the Boys & Girls Club, which offers childcare before and after school" simply "by filling out a single set of release paperwork at the beginning of the school year (or at the beginning of that organization's programming for the year)." Dkt. No. 5-1 at 10; *see also* Dkt. No. 34-1 at 4.

At a meeting on September 18, 2025, the District rejected LifeWise's proposals for semester-long or multiple-absence permission slips, confirmed that LifeWise could not collect permission slips from parents, and confirmed that parents could not designate multiple "pick-up persons" on the permission slips. Dkt. No. 5-1 at 11–12. An email exchange among Ms. Hammer, Ms. Sweeny, the Principal of Emerson, and the regional superintendent ensued over the following days, and the regional superintendent clarified that "parents/guardians [must] send the request" for release to a LifeWise session "within a week of the requested release date." *Id.* at 12, 43. The regional superintendent also stated,

> [S]ince we are releasing the students directly to a non-parent and the parents/guardians can provide permission for the release of the student as late as the morning of the release, they should be able to identify the specific person who will pick up the student; this streamlines things for the attendance secretary so they don't have to check each permission slip to make sure they contain all possible people to pick up the student that day.

*Id.* at 41. She added that "schools are required to confirm that the person seeking release is the parent/guardian and that the same person has the authority to make educational decisions for the student," so the school must receive the permission slip from a student's parent/guardian in person or by email, or from a student (with the parent's phone number on the note so the District "can verify the authenticity of the permission"). *Id.*

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 5

LifeWise states that requiring designation of a specific adult for pick up each time has been onerous for families and LifeWise alike. If the planned-for pick up designee is unavailable for a last-minute reason, such as an illness, parents have to provide a new permission slip, but submitting last minute permission slips is challenging for parents due to busy work schedules, the "hustle and bustle of getting kids out the door in the morning," and the language barriers for the many families for whom English is a second language. *Id.* at 10. Although LifeWise sends weekly text messages to parents to remind them to submit their permission slips, the reminders are often ineffective for "the many families who do not speak English[.]" Dkt. No. 34-1 at 4. Despite the reminders from LifeWise, "there have been many instances when students arrive at the front office expecting to attend LifeWise instruction, only to be told by Emerson staff that they cannot because their parents either submitted a non-conforming permission slip or no permission slip for that week." *Id.* at 4–5. Ms. Hammer states that she is "aware of more than fifteen instances, over nearly a dozen occasions, where students were unable to attend LifeWise due to the District's new permission slip policy," and "[a]lmost every week there is at least one student whose attendance is impacted by the permission slip process." Dkt. No. 29 at 3–5 (providing examples). In addition, one parent has been told on three separate occasions that the District did not receive her emailed permission slips—even though she had submitted them—undermining her confidence in the reliability of the email system. Dkt. No. 34-1 at 6.

The permission slip mishaps also challenge LifeWise's ability to anticipate and plan for the number of students attending on a given day. Dkt. No. 5-1 at 9–10. Without timely permission slips, it cannot coordinate in advance the number of buses to send to the school, or the quantity of lunches and supplies to provide for attendees. *Id.*; *see also id.* at 10 ("We must therefore prepare as though we had full attendance each day, which often means we are spending time and resources we would not have to do if we had an accurate advance headcount.").

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 6

The District states that requiring weekly permission slips "more closely aligns with the District's standard practices for the release of a student during the school day." Dkt. No. 23 at 6. According to the District, requiring the permission slips to identify the adult to whom release is authorized, and requiring permission no later than the morning of the scheduled release, "closely aligns with the permission process applicable any time a student is required to leave school during the school day with an adult other than the parent or guardian" and is "not exclusive to LifeWise." *Id.* The District "follow[s] this process to ensure the safety of the students over whom the school is acting *in loco parentis* (in the place of the parents) while they are at school." *Id.*

**C.    The School Resource Fair**

LifeWise and the District also disagreed about LifeWise's participation in Emerson's annual Community Resource Fair in May 2025. The fair "is a District-sponsored event organized by the Family Engagement Team for the purpose of providing access to resources such as legal, health, mental health, special education services, immunizations, and services provided through the Washington State Department of Social Health Services to families of vulnerable students." Dkt. No. 22 at 3. "[T]here is no official process, open to the public, by which an organization may submit a request to host a table at the Community Resource Fair." *Id.* "Instead, organizations are invited to attend because of their existing relationships with the Family Engagement Team and the services that their organizations provide to families that align with the purpose of the family engagement team." *Id.* The fair takes place outside school hours, and off school grounds, in the District's Community Resource Center during evening hours. Dkt. No. 29 at 5.

In 2025, resource fair participants included Goodwill Industries, Childcare Aware, the Boys and Girls Club of Snohomish County, Bikers Against Child Abuse, Domestic Violence Services Snohomish County, the Care-a-Van mobile health clinic, Black Seed Farms, and "other organizations that provide legal services, health, education, and other community services." Dkt.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 7

No. 5-1 at 13. The District denied LifeWise's April 24, 2025 request to have a booth at the fair because the District "do[es] not allow religious-based organizations of any type to participate in school-sponsored events." *Id.*; *see also id.* at 47. The District cited District Policy 2340P, but LifeWise contends that the policy "permit[s] religious organizations to use District facilities, so long as such use does not interfere with educational activities." *Id.* at 13 (citing generally *id.* at 50–52). LifeWise seeks to participate in the May 2026 fair. *See id.* at 14.

As applicable here, District Policy 2340P states that "[r]eligious services, programs or assemblies shall not be conducted in school facilities during school hours or in connection with any school sponsored or school related activity," and "[s]peakers and/or programs that convey a religious or devotional message are prohibited." *Id.* at 51. Policy 2340P also states that "[s]chool resources, including facilities [and] real property, . . . may be used by religious groups . . . only in accordance with procedures developed by the superintendent or designee" and "[s]uch use must be outside of school hours or when allowable use will not interfere with the school program in compliance with Board Policy 4333 – Non-School Use of Buildings, Grounds and Equipment." *Id.* at 50. In turn, Policy 4333, which the parties did not file, provides: "The public investment in school facilities and the general welfare of the community provide strong justification for the use of school buildings and grounds by community groups for cultural, civic, and recreational purposes." https://docushare.everett.k12.wa.us/docushare/dsweb/Get/Document-1103/4333.pdf (last visited April 23, 2026).

**D.      Flyers Distributed Electronically and in Paper**

Throughout the spring of 2025, LifeWise displayed its paper flyers in the lobby at Emerson. Dkt. No. 5-1 at 14. The District also permits organizations to distribute electronic flyers through an email application called Peachjar. *Id.* Users can send "information directly to families via

email," as long as they obtain District permission to send an eflyer through the application. *Id.* at 54.

On June 13, 2025, Blythe Young, the Principal at Emerson, told Ms. Sweeny that LifeWise flyers would no longer be allowed in the lobby. *Id.* at 14–15. Principal Young explained that pursuant to Policy 2340P, "[s]chool resources . . . may be used by religious groups . . . outside of school hours or when allowable use will not interfere with the school program in compliance with Board Policy 4333," and "[m]aterial and/or announcements promoting religion may not be distributed by non-students or on behalf of groups or individuals who are not students." *Id.* at 57. The District's RTRI Guidelines similarly provide that students may "distribute materials, including religious materials, before and after school," but non-students "are prohibited from distributing materials on campus, and students are not allowed to distribute materials on behalf of groups or individuals who are not students." *Id.* at 38. The District's Distribution of Materials policy echoes this: students are permitted to distribute "student publications or other materials on school premises in accordance with procedures developed by the superintendent," but "[p]ersons other than students may not distribute materials on school grounds." Dkt. No. 22-1 at 29. In addition, Board Policy 3222 states that "[m]aterials may be distributed before or after the school day at points of entry/exit of school buildings" with permission of the school principal, provided that the distribution of materials by students "shall not cause a substantial disruption of school activities or materially interfere with school operations." Dkt. No. 23 at 3; *see also* Dkt. No. 22-1 at 29, 31. "Under this Policy, a student may distribute religious literature under the same conditions that other literature may be distributed on the campus provided it does not intrude on the operation of the school." Dkt. No. 23 at 3.

The written guidelines for use of Peachjar state that because some families lack internet access, organizations should provide the school with printed copies of Peachjar flyers. Dkt. No. 5-

1 at 54. Ms. Hammer states that LifeWise provided written copies of its Peachjar flyers in the Emerson lobby to comply with that policy. Dkt. No. 29 at 5. Ms. Hammer has observed hard copy flyers for "Millenia Ministries," which is "a religious organization that offers assistance to low-income families in the district" whose "Facebook page describes the organization as a 'Faith-based nonprofit.'" *Id.* Meanwhile, the District recommends Millenia Ministries, "as well as other religious organizations like Catholic Community Services, Everett Gospel Mission, the Salvation Army, and Westgate Chapel, as among its 'Community Resources' for at-risk youth[.]" *Id.* at 7; *see also* Dkt. No. 29-4 at 2–3.

LifeWise submitted an electronic flyer for distribution in the fall semester through Peachjar. Dkt. No. 5-1 at 15. On October 22, 2025, the District rejected LifeWise's proposed flyer and required "a few changes" before it was distributed via Peachjar, including "[r]eplac[ing] the photo of the boy praying," which the District said "could be viewed as proselytizing." *Id.* at 15, 59. According to the District, LifeWise flyers were approved for distribution "after LifeWise complied with requested revisions consistent with Peach Jar guidelines and District policies." Dkt. No. 22 at 4.

**E.      LifeWise Materials Prohibited from Classrooms**

When students began attending LifeWise during the school day, Principal Young received some complaints. On December 18, 2025, she received an email from a parent expressing concern that her daughter received a paper in her classroom containing a QR code, along with a handwritten note from a classmate encouraging her to attend LifeWise. Dkt. No. 23 at 4. The parent also stated that LifeWise participants received "bags of candy." *Id.*[1] The same parent also expressed concern that in the same conversation her daughter had with the classmate, "the classmate responded to the

---

[1] LifeWise denies giving "bags of candy" to students, stating that although it gives small treats to students on limited occasions, it prohibits them from bringing the treats back to school. Dkt. No. 29 at 2.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 10

daughter's comment that her mom does not believe in God with, 'you don't have to believe what your mom believes.'" *Id.* The parent stated that she is uncomfortable "with [her] six-year-old being encouraged to attend a religious program during the school day through peer pressure, incentives such as candy, and messaging that appears to undermine family beliefs." *Id.*; *see also* Dkt. No. 23-1 at 2–3. In addition, teachers have discussed concerns with Principal Young about "instances of students attempting to provide [LifeWise] items to other students during the school day," which has "led to multiple disruptions in the classroom." Dkt. No. 23 at 4. LifeWise disputes that students have been disruptive after returning to class, or that the District has ever notified LifeWise of disruptions. Dkt. No. 29 at 3.

Still, "[a]s a result of these concerns, Emerson Elementary began requiring students returning from LifeWise to keep any items they received [during RTRI] in a sealed envelope in their backpacks during the school day." Dkt. No. 23 at 5. The District states that this requirement is consistent "with the same rules applied to students distributing any type of materials, candy or other items, in the classroom from any organizations, religious or secular, or for toys that may also cause disruption in the classroom." *Id.* ("Emerson Elementary has a history, and a current practice, of sending multiple reminders to families asking that students not bring toys or other items to school to avoid disruptions.").

The District's RTRI Guidelines state that "[s]tudents may not return to their classrooms with handouts or other items from the religious organization." Dkt. No. 5-1 at 37. Instead, any "religious materials" must be "sealed in an envelope and placed directly into the student's backpack immediately upon their return to school." *Id.* These guidelines apply to the materials LifeWise provides students, which include its Bibles and recap cards. *Id.* at 11. During this school year, "because of the burden the District's policy has placed on LifeWise and its students, [LifeWise] ha[s] yet to hand out any recap cards" even though it would normally "distribute recap

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 11

cards to students after each weekly class." Dkt. No. 34-1 at 8. LifeWise contends that the RTRI Guidelines prohibit students from "reading their LifeWise Bibles and recap cards during the school day, either during free reading periods or non-instructional time." *Id.* According to Ms. Sweeny, the requirement that students' Bibles remain in their backpacks teaches them that "they must hide their faith when in a public setting" and prohibits them from reading their Bible while at school. *Id.* at 8–9. The District responds that according to the best of Principal Young's knowledge, "no teacher in the school has taken action that would prevent a student from independently choosing to read religious materials during non-instructional time." Dkt. No. 23 at 5.

**F.    Plaintiffs File Suit**

LifeWise and Ms. Sweeny filed their complaint in this Court on December 18, 2025 against the District and its Superintendent, Dr. Ian Saltzman. Dkt. No. 1. Count I is a claim against the District under 42 U.S.C. § 1983 and 28 U.S.C. § 2201 alleging that the District's policy of excluding LifeWise from limited public forums, including the community resource fair and—for the distribution of flyers—Emerson's lobby and the Peachjar platform, violates the First Amendment Free Speech Clause, both facially and as applied to LifeWise. *Id.* at 24–27. Count II is a claim against Dr. Saltzman under 42 U.S.C. § 1983 and 28 U.S.C. § 2201 alleging that his application of the District's policies to LifeWise violates the First Amendment Free Speech Clause. *Id.* at 27–31. Count III is a claim against all Defendants under 42 U.S.C. § 1983 and 28 U.S.C. § 2201 alleging that the new RTRI guidelines that the District adopted in September 2025 violate the First Amendment Free Exercise Clause, both facially and as applied to LifeWise. *Id.* at 31–33. Count IV is a claim by Sweeny against all Defendants under 42 U.S.C. § 1983 and 28 U.S.C. § 2201 alleging that the new RTRI guidelines that the District adopted in September 2025 violate her "First Amendment Parental Free Exercise" rights. *Id.* at 33–35.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 12

On December 18, 2025, Plaintiffs filed this motion for a preliminary injunction on all four counts. Dkt. No. 5. After briefing was complete, Plaintiffs filed a praecipe to correct the Sweeny declaration. Dkt. No. 34. The Court allowed Defendants to file a supplemental response, Dkt. No. 35, and Defendants did so, Dkt. No. 37. The Court also directed the parties to indicate "whether they believe[d] an evidentiary hearing is necessary" on the motion. Dkt. No. 32. In response, the parties "agree[d] that the motion may be resolved on the papers and evidence submitted with the papers" without an evidentiary hearing. Dkt. No. 36 at 1.

On March 26, 2026, the parties filed a stipulation dismissing all claims against Superintendent Saltzman. Dkt. No. 42 (specifying that dismissal encompasses Count II of the Complaint and Counts III and IV of the complaint to the extent they are asserted against Mr. Saltzman).

## II.    DISCUSSION

Plaintiffs contend that the District violated their First Amendment rights by restricting equal access to its public forums; subjecting LifeWise and LifeWise parents (including Ms. Sweeny) to an onerous permission slip policy; and "requiring LifeWise materials, and LifeWise materials alone, be sealed in an envelope and hidden away in a backpack" while students are at school. Dkt. No. 5 at 14. They seek an injunction requiring the District to (1) permit LifeWise to participate in the District's community resource fairs; (2) permit LifeWise to display its flyers in schools of the District where secular organizations are allowed to do so; (3) permit Emerson Elementary School students "to be released for LifeWise programs with permission slips that (a) release custody of the students to LifeWise, Inc., and (b) allow parents to specify that the release can applies for up to each day during the school year that LifeWise offers its programs to Emerson Elementary School students"; (4) "[r]efrain from enforcing any requirements on LifeWise that do not apply to every other organization to whom the school releases custody of students;" and

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 13

(5) permit Ms. Sweeny's children to read LifeWise materials at times of the school day during which students may read other non-scholastic materials, rather than having to keep the LifeWise materials in a sealed envelope. Dkt. No. 5-4 at 3–4.

## A.    Legal Standard

To obtain a preliminary injunction, plaintiffs must establish (1) that they are "likely to succeed on the merits," (2) that they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [their] favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The mere "possibility" of irreparable harm is insufficient; instead, the moving party must "demonstrate that irreparable injury is likely in the absence of an injunction." *Id.* at 22.

The Ninth Circuit employs a "sliding scale" approach, under which the four elements are balanced "so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). For example, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. The moving party bears the burden of persuasion and must make a clear showing that it is entitled to such relief. *Winter*, 555 U.S. at 22.

Although individual appellate panels have questioned the usefulness of the distinction, the Ninth Circuit distinguishes between "mandatory" and "prohibitory" injunctions. *Hernandez v. Sessions*, 872 F.3d 976, 997–98 (9th Cir. 2017). Prohibitory injunctions "aim to preserve the status quo by preventing a party from taking action," while mandatory injunctions "alter[] the status quo by requiring a party to take action and thus place[] a higher burden on the plaintiff to show the facts and law *clearly* favor the moving party." *Youth 71Five Ministries v. Williams*, 160 F.4th 964,

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 14

978 (9th Cir. 2025) (citation modified). Here, Plaintiffs seek a prohibitory injunction that requires the District to refrain from certain conduct, and a mandatory injunction that requires the District to take certain actions, *see* Dkt. No. 5-4 at 3–4.

**B.      Free Speech Rights and Access to District Forums**

LifeWise argues that "[t]he District infringed on [its] free speech rights" by "exclud[ing] LifeWise from the annual community resource fair," "prohibit[ing] LifeWise from placing flyers in the Everett Elementary School lobby on a table designated for the presentation of flyers by secular groups," and "censor[ing] LifeWise from distributing a flyer about its programming on the electronic forum the District uses for that purpose (Peachjar) because it included an image of a child praying." Dkt. No. 5 at 15. It argues that "[a]ll three of the forums here—the community resource fair, the school table designated for hardcopy flyers, and Peachjar—are limited public forums." *Id.* LifeWise further contends that the District excluded it from these forums based on LifeWise's religious message, and thus engaged in viewpoint discrimination. *Id.* at 17.

The District responds by asserting in conclusory fashion that the forums at issue here are nonpublic. Dkt. No. 21 at 14. It notes that "[i]n a nonpublic or limited public forum, restrictions on speech are permissible if they are viewpoint neutral and reasonable in light of the purpose served by the forum." *Id.* According to the District, any exclusion of LifeWise "was based on neutral and reasonable policies." *Id.*[2]

The Free Speech Clause, applicable to state actors through the Fourteenth Amendment, states that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. Const. amend. I. The extent to which a government entity may regulate speech depends in part on the type of

[2] The District does not rely on the government speech defense or argue that it was speaking for itself through the community resource fair or the flyers. *See generally* Dkt. No. 21 at 14–19; *see also Shurtleff v. Boston*, 596 U.S. 243, 247 (2022) (noting that government speech doctrine permits viewpoint discrimination when the "government speaks for itself").

forum that is subject to the regulation. The Supreme Court recognizes three types of forums: traditional public forums, designated public forums, and nonpublic forums. *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018). "In a traditional public forum—parks, streets, sidewalks, and the like—the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Id.* (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). "The same standards apply in designated public forums—spaces that have not traditionally been regarded as a public forum but which the government has intentionally opened up for that purpose." *Id.* (citation modified). "In a nonpublic forum, on the other hand—a space that 'is not by tradition or designation a forum for public communication'—the government has much more flexibility to craft rules limiting speech." *Id.* (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)). The government may reserve a nonpublic forum "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n*, 460 U.S. at 46. Because the government can control the use of nonpublic forums, it may "may impose some content-based restrictions on speech" in such forums. *Minn. Voters All.*, 585 U.S. at 12. Even with nonpublic forums, however, restrictions must be viewpoint neutral and "reasonable in light of the purpose served by the forum[.]" *Id.* at 13; *see also Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) (restrictions are permissible "so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral"). The same is true of a "nonpublic forum open for a limited purpose"—also referred to as a "limited public forum." *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 965, 967 (9th Cir. 1999) ("In a limited public forum, restrictions that are viewpoint neutral and reasonable in light of the purpose served by the forum are permissible.").

1.  <u>The Community Resource Fair</u>

LifeWise contends that the resource fair "operates as a limited public forum" because it was advertised as open to all, but the District excluded LifeWise because of its religious message. Dkt. No. 5 at 15–17. According to LifeWise, this is viewpoint discrimination. *Id.* at 17. The District responds that the resource fair is "a quintessential nonpublic forum." Dkt. No. 21 at 15. The District contends that it denied LifeWise's request to host a table because its participation in the event "was not consistent with the purpose of the event (i.e., providing access to community services)." *Id.*

The resource fair is a limited public forum because the District has opened it "to certain groups," i.e., those who present resources to students and families. *Hills v. Scottsdale Unified School Dist. No. 48*, 329 F.3d 1044, 1049 (2003). As such, "restrictions are permissible if they are viewpoint neutral and reasonable in light of the purpose served by the forum." *Id.* Here, the District's exclusion of LifeWise does not appear reasonable in light of the purpose of the fair.[3] The District's General Counsel notes that the "family engagement team" organizes the fair for the "purpose of providing access to resources such as legal, health, mental health, special education services, immunizations, and services provided through the Washington State Department of Social Health Services to families of vulnerable students." Dkt. No. 22 at 3. Entities are invited to attend because "the services that their organizations provide to families . . . align with the purpose of the family engagement team," which is to "connect[] vulnerable students and families with community resources throughout the year." *Id.*

Although the District argues that excluding LifeWise from the fair was justified because "the relatively narrow purpose of the event is to provide access to resources for students and their

---

[3] Principal Young's declaration states only that the fair "is a District sponsored event organized by the Family Engagement Team." Dkt. No. 23 at 3. The declarations do not state who comprises the Family Engagement Team, but because one of the declarations refers to it as "[t]he District's Family Engagement Team," Dkt. No. 22 at 3, the Court assumes that it is either comprised of District employees or otherwise authorized to make fair-related decisions on the District's behalf.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 17

families" and LifeWise's attendance "was not consistent with the purpose of the event (i.e., providing access to community services)," Dkt. No. 21 at 15, 17, the record indicates that the District does not limit the fair to a narrow type of resources. *See* Dkt. No. 22 at 3 (listing the fair to resources "such as" the broad categories included). LifeWise responds that it *does* provide resources to families, "namely, *religious instruction*" with the goal of "improving student behavior and academic achievement." Dkt. No. 28 at 11 (citing Dkt. No. 5-3 at 21–26); *see also* Dkt. No. 5-1 at 1–2 (explaining that LifeWise's religious instruction includes lessons aimed at character development). In addition, the term "resources" is "unmoored" from any definition provided by the District. *See Minn. Voters All.*, 585 U.S. at 16. And the general definition of "resources" is expansive, including "a source of supply or support" and "a source of information or expertise." Resources, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/resources (last visited February 11, 2026). The religious and moral instruction LifeWise provides could be construed as a "source of information" and "support" to families and for students' academic success. Indeed, the fair's "community services" are analogous to events "pertaining to the welfare of the community" in *Good News Club v. Milford Central School District*, 533 U.S. 98, 107–09 (2001) and to use of school facilities for "social, civic or recreational" purposes in *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384, 393–96 (1993), which the Supreme Court found to encompass religious organizations' speech for purposes of the Free Speech Clause.

Furthermore, the District cited policy 2340P when denying LifeWise's request to participate in the fair, *see* Dkt. No. 5-1 at 47, but as LifeWise notes, the policy cited within policy 2340P (that is, policy 4333) permits religious organizations to use District facilities as long as doing so does not interfere with educational activities, Dkt. No. 5-1 at 50; https://docushare.everett.k12.wa.us/docushare/dsweb/Get/Document-1103/4333.pdf (last visited

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 18

April 23, 2026). The District does not contend that LifeWise's attendance at the fair would interfere with educational activities. *See generally* Dkt. No. 21. Accordingly, in light of the fair's stated purpose to allow third parties to present their resources to families, the broad definition of the term "resources," the District's policies, and the absence of District guidelines about what is a welcomed "resource" at the fair, the exclusion of faith-based resources is not reasonable. *Minnesota Voters All.*, 585 U.S. at 19.

The District also argues that its exclusion of LifeWise from the fair is reasonable because it has an "interest in avoiding the impression that it has endorsed LifeWise's religious program." Dkt. No. 21 at 16. In making this argument, the District seems to be advancing a defense based on the Establishment Clause. But "there is 'play in the joints' between what the Establishment Clause permits," *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) (citation modified), and what the Free Speech Clause requires. "An Establishment Clause violation does not automatically follow whenever a public school or other government entity fails to censor private religious speech," nor does the Clause "compel the government to purge from the public sphere anything an objective observer could reasonably infer endorses or partakes of the religious." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534–35 (2022) (citation modified).

Once a school "opens a governmental space to non-governmental speakers, that control does not permit viewpoint-based restrictions," regardless of whether the forum is public or nonpublic. *Flores v. Bennett*, 635 F. Supp. 3d 1020, 1031–32 (E.D. Cal. 2022). To be sure, "in the context of a limited public forum, content discrimination may be permissible *if* it preserves the purposes of that limited forum." *Hills*, 329 F.3d at 1051. That is, "a speaker may be excluded from a nonpublic forum if [it] wishes to address a topic not encompassed within the purpose of the forum" but not "to suppress the point of view [it] espouses on an otherwise includible subject." *Cornelius*, 473 U.S. at 806; *see also Lamb's Chapel*, 508 U.S. at 396 (stating that it "would be

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 19

difficult to defend . . . deny[ing] the presentation of a religious point of view about a subject the District otherwise opens to discussion on District property"); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829–30 (1995) (distinguishing between "content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations"); *Hills*, 329 F.3d at 1051 (noting that the Supreme Court has "stressed that viewpoint discrimination is not permissible when it is directed at speech otherwise falling within the forum's limitations"). As set forth above, LifeWise seeks to present a resource for families and students at the fair, Dkt. No. 5-1 at 13, and thus to "address a topic . . . within the purpose of the forum[.]" *Cornelius*, 473 U.S. at 806. Accordingly, LifeWise "seeks nothing more than to be treated neutrally and given access to speak about the same topics as are other groups." *Good News Club*, 533 U.S. at 114. "Because allowing [LifeWise] to speak on school grounds would ensure neutrality, not threaten it, [the District] faces an uphill battle in arguing that the Establishment Clause compels it to exclude [LifeWise]." *Id.* Indeed, the fair occurs after school hours, off school grounds (at the District's Community Resource Center), and includes no "curricular instruction." Dkt. No. 29 at 5. The fair therefore "has a secular purpose, does not have the principal or primary effect of advancing or inhibiting religion, and does not foster an excessive entanglement with religion." *Lamb's Chapel*, 508 U.S. at 395.[4] Accordingly, the District's implied Establishment Clause defense is unfounded.

The record confirms that the District excluded LifeWise from participation in the fair because it is a religious-based organization. *See* Dkt. No. 5-1 at 57 (stating that "pursuant to Everett

---

[4] In addition, the District's concern about a misperception of endorsement could be alleviated "by making it clear to students that [an entity's] private speech is not the speech of the school," *Prince v. Jacoby*, 303 F.3d 1074, 1094 (9th Cir. 2002); *see also id.* at 1092 (finding no Establishment Clause violation when the group sought only to be treated neutrally and given access to speak about the same topics as other groups).

Public Schools Policy and Procedure 2340P, [the District] do[es] not allow religious-based organizations of any type to participate in school-sponsored events."). A policy is not viewpoint neutral simply because it is "applied in the same way to all uses of school property for religious purposes" or treats "all religions and all uses for religious purposes" alike. *Lamb's Chapel*, 508 U.S. at 393. Rather, the "critical question" is whether a policy "discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about [a particular issue] except those dealing with the subject matter from a religious standpoint." *Id.* Here, the District has allowed entities to present their resources to students and families if they are secular, but precluded LifeWise from presenting a resource—that purportedly promotes character development and higher academic achievement—through a religious perspective. In doing so, the District has engaged in viewpoint discrimination. *See, e.g.*, *Good News Club*, 533 U.S. at 111–12 (holding that "speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint"); *see also Lamb's Chapel*, 508 U.S. at 394 (holding that a school district violated the free speech clause by preventing a group from screening films at the school based solely on its religious perspective); *Hills*, 329 F.3d at 1050 (noting that the Supreme Court has held that "if a school opened its doors to groups that 'promote the moral and character development of children,' it could not exclude religious groups" promoting the same thing from a religious perspective (quoting *Good News Club*, 533 U.S. at 108)).

Accordingly, LifeWise has shown a likelihood of success on its claim that the District's exclusion of LifeWise from the resource fair violates its free speech rights.

2. The Flyers in the Emerson Lobby and Peachjar

LifeWise's arguments regarding its flyers largely mirror its arguments regarding the resource fair: the District has created a limited public forum and engaged in viewpoint

discrimination by excluding LifeWise's flyers based on their religious message. Dkt. No. 5 at 15–17. LifeWise notes that "organizations that offer services to Everett Public School families are given the chance to promote those services to the school community," and other entities that have "circulated electronic and hardcopy flyers include an eye center, a robotics club, and a doctor's office." *Id.* at 16 (citing Dkt. No. 5-1 at 14). LifeWise also states that a "religious ministry, which offers services to at-risk youth and families," was permitted to display its flyers in the Emerson lobby. Dkt. No. 5-1 at 14. LifeWise notes that its flyers contain specific disclaimers that they do not speak for the District. Dkt. No. 5 at 16. Still, on June 13, 2025, Principal Young informed Ms. Sweeny that LifeWise could no longer display its flyers in the Emerson lobby based on policy 2340P. Dkt. No. 5-1 at 14–15, 57.

The District responds that "school grounds are nonpublic forums for purposes of distributing flyers, as the school screens the flyers' content before it allows them to be distributed." Dkt. No. 21 at 17. According to the District, it "has not regulated LifeWise's flyers due to the [sic] LifeWise's viewpoint, but rather the religious content of the flyers." *Id.* at 18; *see also* Dkt. No. 5-1 at 51 (policy 2340P stating that "[m]aterial and/or announcements promoting religion may not be distributed by non-students or on behalf of groups or individuals who are not students.").

The forum here is the District's flyer distribution program. As is the case with the resource fair, the distribution of flyers is a limited public forum because the District has opened it "to certain groups or topics." *Hills*, 329 F.3d at 1049. Regardless, even with nonpublic forums, the District cannot engage in viewpoint discrimination. *Flores*, 635 F. Supp. 3d at 1032.

The Court finds that the District's prohibition on LifeWise displaying its flyers in the lobby is viewpoint discrimination for the same reasons set forth above with respect to the community resource fair. Having opened the forum to a diverse array of speakers who provide services to families, Dkt. No. 5-1 at 14, the District cannot deny the same access to LifeWise, which provides

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 22

a service to families through a religious viewpoint. Again, the fact that the District seeks to exclude all religious flyers is not dispositive when the District has allowed entities to present their services to students and families if they are secular. *See, e.g.*, *Hills*, 329 F.3d at 1052 ("Premising refusal of permission to advertise an event or class based on the religious nature of the event or class cannot be justified under our precedents, where other similar groups can advertise events or classes similar except for their lack of religious viewpoint.").

The District relies on *DiLoreto* to argue that it can exclude all religious-based flyers based on their religious content and that it "has an interest in avoiding disruption and potential controversy that might arise from allowing flyers that proselytize to elementary school students." Dkt. No. 21 at 18 (citing *DiLoreto*, 196 F.3d at 968). However, the District's argument on this issue is conclusory and cites to nothing in the record to support its factual assertions regarding disruption and controversy. In *DiLoreto*, the Court found that the district's rejection of a religious advertisement—which stated, "Pause & Meditate on These Principles to Live By!" and then listed the Ten Commandments, *DiLoreto*, 196 F.3d at 962—over "concerns regarding disruption and potential controversy" was reasonable "given the purpose of the forum and the surrounding circumstances of the public secondary school." *Id.* at 968. Specifically, as LifeWise notes, Dkt. No. 28 at 10, the advertisements were on a playing field used by the school "for physical education classes and for school-sponsored sporting events," where "students at these activities would be a captive audience to the ads." *DiLoreto*, 196 F.3d at 968. Thus, the ad would be disruptive to the "educational purpose" of the school. *Id.* at 962. There is no such allegation or evidence here. The Emerson students are not captive audiences to flyers in the lobby or on Peachjar. And unlike in *DiLoreto*, where the school district never permitted "anything other than commercial advertising" at the play field, *id.* at 963, here, the District allows multiple types of entities and clubs to display flyers in its lobby and on Peachjar. Dkt. No. 5-1 at 14. In fact, LifeWise has presented unrebutted

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 23

evidence that the District allowed at least one other religious organization to display its flyers in the lobby while denying LifeWise the same access. *Id.* at 14–15.[5]

Finally, although the District's response to the motion notes a concern with "avoiding the appearance of endorsing particular viewpoints," Dkt. No. 21 at 18, as discussed above with respect to the community resource fair, LifeWise seeks nothing more than to be treated the same as other groups. Furthermore, LifeWise's flyers include "statements disclaiming any affiliation to the District, as required by the District's guidelines." Dkt. No. 5-1 at 14.

With respect to Peachjar, the District contends that "LifeWise was never denied access to the platform." Dkt. No. 21 at 18 (citing Dkt. No. 22 at 4). It notes that "[s]chool officials did request LifeWise revise some of its proposed flyers, but LifeWise complied with these requests, and the school then distributed the flyers accordingly." *Id.* at 18–19. Specifically, the District sent LifeWise an email stating that its proposed flyer was "denied" because it included a photo of a boy praying, which "could be viewed as proselytizing." Dkt. No. 5-1 at 59 (the District writing, "Per procedure 4140P, we cannot share information that could be viewed as proselytizing"); *see also id.* at 15 (the flyer). LifeWise argues that "even requiring [it] to change its message constitutes impermissible speech repression." Dkt. No. 28 at 8 n.4.

Although an organization does not have a "right to pray or proselytize in any manner through [a] school's public dissemination systems," *Prince*, 303 F.3d at 1087, here, the District has not explained why inclusion of the small photo of the boy praying was "proselytizing." *See* Dkt. No. 22 at 4. Rather, in the absence of any prayer-related text in the flyer, it appears that the photo is more akin to a religious symbol, like a Bible, indicating that classes will be taught from a Christian perspective, rather than proselytizing. *See Hills*, 329 F.3d at 1052–53 (finding that a

---

[5] The District did not respond to Plaintiffs' argument about the other religious organization, so the Court cannot conclude that the District halted that organization's lobby access when it precluded LifeWise from displaying its flyers in the lobby. Dkt. No. 5-1 at 14–15.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 24

school district engaged in viewpoint discrimination by requiring the excision of "all of the Bible course descriptions . . . , along with any religious symbols, because these indicated that the Bible would be taught from a Christian viewpoint," but did not discriminate when it excluded certain language that "was promotional not only of the class but of religion, and went beyond a description of the organization's general religious mission to directly exhort the reader to involve children in religious observance"). Thus, its exclusion was viewpoint discrimination. *Id.* at 1053.

For these reasons, LifeWise has shown a likelihood of success on its claim that the District has violated its free speech rights with respect to the flyers.

**C.    The Requirement to Seal Away Religious Materials**

Plaintiffs contend that the District's policy requiring students to seal away LifeWise materials while on campus violates Ms. Sweeny's free exercise rights. Dkt. No. 5 at 25–27. They argue that because LifeWise materials "'are to be sealed in an envelope and placed directly into the student's backpack immediately upon their return to school,' . . . students may not study their LifeWise material *at any time* during the day—including times when students would otherwise be free to quietly study *any other book*." *Id.* at 25 (quoting RTRI Guidelines, Dkt. No. 5-1 at 37). According to Plaintiffs, this requirement conflicts with "the right of parents to direct the religious upbringing of their children," and substantially interferes with Ms. Sweeny's "ability to direct the religious education of her children" in several ways. *Id.* at 26.

The parties talk past each other on this issue. The District does not contest that students should be allowed to read the Bible or religious materials during free time; indeed, it emphasizes that "there is no District policy that prevents [Ms. Sweeny's] child from doing so." Dkt. No. 21 at 25. And Policy 2340 states that "[s]chool staff shall neither encourage, nor discourage a student from engaging in non-disruptive oral or silent prayer or any other form of devotional activity," which would presumably include reading the Bible or similar religious materials during free

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 25

periods. Dkt. No. 22-1 at 27. The problem is that the District's RTRI Guidelines conflict with what the District says it allows. Specifically, the Guidelines require that "[i]f religious materials are distributed off-site by the organization to the students, they are to be sealed in an envelope and placed directly into the student's backpack immediately upon their return to school." Dkt. No. 5-1 at 37. Principal Young has confirmed that this written requirement means what it says. *See* Dkt. No. 23 at 5 (stating that Emerson "require[es] students returning from LifeWise to keep any items they received in a sealed envelope in their backpacks during the school day"). As Plaintiffs note, "A student cannot read a Bible that is sealed in an envelope in her backpack." Dkt. No. 28 at 13.

Because the District does not contest that students should be permitted to read religious materials during free time, and implicitly concedes that the RTRI Guidelines conflict with this policy,[6] an injunction permitting Ms. Sweeny's children to read religious materials during free periods is warranted.[7]

---

[6] The District also argues that the Guidelines exist "to curb the significant disruptions that have occurred in the classroom from the candy and flyers brought back from LifeWise that were distributed by students during class." Dkt. No. 21 at 24. However, the reports of classroom disruptions in the record are few, vague, secondhand, and unaccompanied by any explanation of whether the District tried to quell the (limited) disruptions with admonishments to students. Dkt. No. 23 at 4–5. And there is conflicting evidence in the record about whether students return to school with candy from LifeWise. *Compare* Dkt. No. 23 at 4, *with* Dkt. No. 29 at 2. Regardless, LifeWise does not ask the Court to order that students be able to eat or share LifeWise-provided candy or distribute LifeWise flyers during breaks; only that students be permitted to read "*their own* [LifeWise-provided] materials." Dkt. No. 28 at 14. The RTRI Guidelines are overbroad because they require students to leave *all* LifeWise materials, including Bibles, in their backpacks, not just the candy and flyers that were allegedly disruptive.

The District also advances another Establishment Clause argument here, but the District has not shown that permitting students to read their own LifeWise materials during free time would entangle the District with religion or otherwise run afoul of the Establishment Clause. *See Lamb's Chapel*, 508 U.S. at 395. Again, the District's total ban on students' reading LifeWise religious materials during free time when students may read other texts conflicts with its own representation that "there is no District policy that prevents [students] from doing so." Dkt. No. 21 at 25.

[7] Plaintiffs' proposed order sweeps broadly, permitting Ms. Sweeny's children "to keep LifeWise *materials* on their person or in their backpacks without keeping them in a sealed envelope." Dkt. No. 5-4 at 4 (emphasis added). But Plaintiffs have not addressed what those "materials" might be other than those addressed in this section. Therefore, the Court enjoins the District from preventing Ms. Sweeny's children from accessing LifeWise *reading* materials during free periods, but not all "materials."

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 26

**D.     Free Exercise Rights and the Permission Slip Policy**

    1.   The Permission Slip Policy Violates Plaintiffs' Free Exercise Rights

Plaintiffs contend that the District violated their free exercise rights through its permission slip policy. Dkt. No. 5 at 18. First, Plaintiffs argue that the District has been openly hostile to LifeWise, and that "overt hostility, intertwined with the enactment of restrictive policies targeting LifeWise by name, constitutes a Free Exercise violation." *Id.* at 18–20; *see also* Dkt. No. 28 at 3–4. Second, Plaintiffs contend that "the District's policies *also* fail strict scrutiny because they are neither 'neutral' nor 'of general application.'" Dkt. No. 5 at 21. The District denies that there is any hostility toward LifeWise, and avers that its policies are neutral and do not burden religious exercise. Dkt. No. 21 at 19–22.

As to the first issue, a plaintiff may prove a free exercise violation "by showing that 'official expressions of hostility' to religion accompany laws or policies burdening religious exercise; in cases like that [courts] have 'set aside' such policies without further inquiry." *Kennedy*, 597 U.S. at 525 n.1 (quoting *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 584 U.S. 617, 625 (2018)). Plaintiffs contend that "[t]he District articulated—and then emphasized—obvious animus here." Dkt. No. 5 at 19. Specifically, they note when Ms. Sweeny and Ms. Hammer met with school board President Mitchell before a June 2025 school board meeting, President Mitchell said something to the effect that "she did not like LifeWise's presence in the District, and that 'religion and public schools do not go together.'" Dkt. No. 5-1 at 8. Plaintiffs also state that at a July 1, 2025 school board meeting, school board Director Charles Adkins "accused LifeWise of having a 'mission to bring white supremacy and Christian nationalism to [Everett] schools' and insisted that LifeWise 'cannot be allowed to have access to our kids.'" *Id.* at 7. At the same meeting, Mr. Adkins accused LifeWise of trying "to snuff out the cultures, religion, and language of native kids and other kids of color." *Id.* At a September 10, 2025 school board meeting, the day

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 27

after the new RTRA Guidelines were announced, President Mitchell stated that the Board "do[es] not support or endorse programs that provide off-campus religious instruction during the school day and prefer[s] that students stay at school." *Id.* at 8 & n.28. Later, at a December 8, 2025 school board meeting, Mr. Adkins stated,

> I want to make it very, extremely, abundantly clear, that yes, I do in fact hold animus toward LifeWise Academy. . . . It is an organization of homophobic bullies who are active and willing participants in the efforts to bring about an authoritarian theocracy. . . . [W]hat I find offensive and ridiculous is their anti-gay agenda. Their curriculum teaches that any relationship outside a man and a woman is a sin.

*Id.* at 8 (emphasis omitted).

The District responds that Mr. Adkins does not speak for the District. Dkt. No. 21 at 3. District policy 1240, Duties of Individual Board of Directors, states that "[t]he authority of individual board members is limited to participating in actions taken by the board as a whole when legally in session," and "[b]oard members shall not assume responsibilities of administrators or other staff members." Dkt. No. 22-1 at 9. In addition, "The board or staff shall not be bound in any way by any action taken or statement made by any individual board member except when such statement or action is pursuant to specific instructions and official action taken by the board." *Id.* Plaintiffs respond that "[a]s a legal matter, the question is not whether any Board member speaks for the Board, but whether Board members' hostile comments—to which no member objected— show that animus toward LifeWise motivated the change in policy targeting LifeWise that followed the comments." Dkt. No. 28 at 4; *see also* Dkt. No. 5-1 at 8 ("No other Board member has ever expressed disagreement with Mr. Adkins's statements at a Board meeting.").

The Court agrees with Plaintiffs that even if Mr. Adkins was not legally speaking for the Board, evidence of his animus toward LifeWise is relevant. "The board of directors of the Everett School District . . . plan[s] and direct[s] all aspects of the district's operations[.]" Dkt. No. 22-1 at 6. Accordingly, the school board, which included Mr. Adkins, had at least some role in approving

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 28

the new RTRI guidelines. And when considering alleged animosity toward religion, courts can look to statements of decision makers. *See Masterpiece Cakeshop*, 584 U.S. at 636. In addition, even if Mr. Adkins was not speaking for the District, "[t]he record shows no objection to [his] comments" from the other school board members. *Id.* Moreover, President Mitchell—who undisputedly *does* speak for the Board—stated a preference that kids "stay at school" and opined that "religion and public schools do not go together." Dkt. No. 5-1 at 8. These were not stray remarks. The first was made during a school board meeting about LifeWise, and the second was made before another board meeting. *Id.* In addition, after an August 20, 2025 school board meeting in which a community member compared LifeWise to the Nazi Party, taking "trains . . . through [German] towns . . . [that] were filled with broken down souls on their way to the gas chambers," President Mitchell closed the public comment session by stating, "We do appreciate you coming back and you are being heard. So, thank you. It might not look like it, but you are." *Id.* at 7 & nn.20–21. President Mitchell later emailed the same commenter and told her, "On behalf of the Everett Public Schools Board of Directors, I want to thank you for taking the time to address the board" and that the commenter's "comments about the impact of LifeWise and [her] call for decisive action were heard." *Id.* at 7 & n.22; *id.* at 31. These statements show animus toward LifeWise and support of the hostility expressed by at least one community member.

The proximity in timing also supports a finding that the new permission slip policy arose from school board animus toward LifeWise. Dkt. No. 5 at 20 (Plaintiffs' argument that "[t]his timing confirms that the Board responded to 'pressure from citizens' who expressed hostility toward LifeWise."). The District followed a less onerous permission slip policy in the Spring of 2025 without incident. Dkt. No. 5-1 at 3. However, soon after President Mitchell and Mr. Adkins made the above remarks in June through August 2025—and other community members expressed hostility to LifeWise during the same school board meetings—the District announced that it was

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 29

adopting the new restrictive RTRI guidelines (which refer to LifeWise by name) on September 9, 2025. *Id.* at 5–9. Furthermore, the record indicates that the District is treating student releases to LifeWise differently than other student releases. The District states that the permission slip policy for LifeWise "closely aligns" with the District's "standard process" for the release of a student without (1) providing that "standard process," (2) divulging the differences between the standard process and the process required of LifeWise, or (3) explaining why the standard process does not apply to LifeWise. Dkt. No. 21 at 10; Dkt. No. 23 at 6. For these reasons, the Court cannot conclude that the permission slip policy is neutral or generally applicable.

The Court also finds that the District burdened Plaintiffs' religious expression. The District contends that the permission slip policies do "not infringe on the Plaintiffs' rights to freely exercise their religion," because "the District has never declined any parent's request to release their students to participate in religious instruction during the school day." Dkt. No. 21 at 21. But this argument ignores Plaintiffs' evidence of "more than fifteen instances, over nearly a dozen occasions, where students were unable to attend LifeWise due to the District's new permission slip policy." Dkt. No. 29 at 3–5.

Here again, the District advances the same Establishment Clause defense that it advanced with respect to the envelope requirements discussed above. Dkt. No. 21 at 22–24. The Court rejects the defense fails for the same reasons set forth above.

In sum, the Court finds that Plaintiffs have shown a likelihood of success on their claims that the permission slip policy violates their free exercise rights.

2. The Scope of the Injunction

One issue remains: the appropriate scope of the injunction regarding the permission slip issue. "Although the district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction, the injunction must be tailored to remedy the specific harm

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 30

alleged." *Galvez v. Jaddou*, 52 F.4th 821, 834 (9th Cir. 2022) (citation modified). "An overbroad injunction is an abuse of discretion." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (citation omitted).

In addition, Federal Rule of Civil Procedure 65(d)(1) requires that any injunction must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." "[T]he specificity provisions of Rule 65(d) are no mere technical requirements"; the Rule was designed "to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Vasquez Perdomo v. Noem*, 148 F.4th 656, 679 (9th Cir. 2025). Finally, "[t]he terms of the injunction should be clear enough to be understood by a lay person, not just by lawyers and judges." *Id.*

Plaintiffs request that the Court require the District to "[r]efrain from enforcing any requirements on LifeWise that do not apply to every other organization to whom the school releases custody of students," Dkt. No. 5-4 at 4, but that proposed provision is too vague to be understood. As written, it could bind the District to apply the same requirements to LifeWise as it does to other unidentified organization regardless of their circumstances. Plaintiffs specifically identify the Lego Club and Boys & Girls Club as comparators, Dkt. No. 5 at 22, but they present no evidence that those two clubs transport the students off campus during the school day like LifeWise does, Dkt. No. 5-1 at 3; Dkt. No. 5-2 at 4; Dkt. No. 23 at 6. Plaintiffs have presented no evidence that any other entity transports students off campus. For these reasons, the Court will not prohibit the District from "enforcing any requirements on LifeWise that do not apply to every other organization to whom the school releases custody of students." Dkt. No. 5-4 at 4.[8]

---

[8] Although Plaintiffs complain that LifeWise can no longer collect permission slips for parents as it used to do, they do not seek an injunction regarding that issue. *See generally* Dkt. No. 5-4.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 31

Plaintiffs also seek an injunction requiring the District to allow release of students "to LifeWise, Inc." *Id.* at 3. However, the District does not permit student release to any other entity (as opposed to a person), or permit any entity to transport students off campus during the school day. Dkt. No. 23 at 6. And again, "[t]he scope of the remedy must be no broader and no narrower than necessary to redress the injury shown by the plaintiff[.]" *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018). Although plaintiffs note that it is logistically difficult for families and LifeWise when permission must be obtained last minute, they have identified no reason why it is less burdensome to allow release to LifeWise (as opposed to a small handful of people). Indeed, LifeWise suggested to the District that it allow release to up to five specific individuals associated with LifeWise. Dkt. No. 5-1 at 9, 33. Accordingly, the Court will not require the District to allow the release of students to "LifeWise, Inc." However, because the District does not contest Plaintiffs' point that it allows students to be released to multiple individuals, such as "Grandma and Grandpa," Dkt. No. 5-1 at 12, and the District previously allowed "each permission slip to authorize release of students to up to four designated individuals" without incident, Dkt. No. 34-1 at 4, the District must permit the release of up to four specifically identified people for LifeWise instruction. This relief is narrowly tailored to alleviate the burden to families—including the burden of potentially missed LifeWise classes—that could occur when one designated person is unavailable. *See* Dkt. No. 5-1 at 10.

Plaintiffs also request an injunction that would "allow parents to specify that the release can applies for up to each day during the school year that LifeWise offers its programs to Emerson Elementary School students[.]" Dkt. No. 5-4 at 3–4. It is unclear what this sentence means or if Plaintiffs are now seeking one permission slip for the entire school year. Again, Plaintiffs have not shown that a year-long permission slip is needed when they proposed a semester-long permission slip to the District. Dkt. No. 5-1 at 8, 33. For its part, as noted above, the District states that its

permission slip requirement for LifeWise "closely aligns with the permission process applicable any time a student is required to leave school during the school day with an adult other than the parent or guardian." Dkt. No. 23 at 6. However, it provides no details and fails to identify any other type of repeated absence that requires permission to be given every week. In contrast, Plaintiffs have established the burdensomeness of weekly permission slips, a requirement that has resulted in numerous missed LifeWise sessions. Dkt. No. 29 at 3–5; Dkt. No. 34-1 at 4–5. In light of this evidence, the District must permit parents and guardians to give permission for a full semester, so long as the written permission identifies the specific dates and times of release in addition to the person(s) to whom the student may be released. These requirements are narrowly tailored to address the harm alleged. *See Galvez*, 52 F.4th at 834.

**E.      Plaintiffs Have Demonstrated Irreparable Harm**

LifeWise contends that the District's policy and practices are causing irreparable harm "because it cannot promote its program on equal footing with secular programs, reducing the success of its core mission (to provide an off-campus religious educational opportunity for students)." Dkt. No. 5 at 28. As set forth above, LifeWise cannot participate in the resource fair or display its flyers as other organizations can.

The District responds that it "has no knowledge, and the Plaintiffs have provided no evidence, of any students unable to attend LifeWise or fully participate in the program." Dkt. No. 21 at 25. This statement is undermined by the record, which contains examples of students missing LifeWise classes because of the onerous permission slip policy. Dkt. No. 29 at 3–5. The District's assertion that its permission slip process "is not onerous" does not make it so. Dkt. No. 21 at 25.

The District also argues that Ms. Sweeny is merely speculating that "her child is unable to read the Bible or religious material during breaks" because "there is no District policy that prevents her child from doing so." *Id.* Again, this is inconsistent with the record. The District's RTRI

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 33

Guidelines require students to seal LifeWise materials in an envelope in their backpack "immediately" upon returning to school. Dkt. No. 5-1 at 37.

Plaintiffs have thus demonstrated irreparable harm.

**F.    The Balance of Equities and the Public Interest**

The balance of equities and public interest factors merge when the federal government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). And constitutional violations weigh heavily in favor of an injunction. *Betschart v. Oregon*, 103 F.4th 607, 625 (9th Cir. 2024).

Plaintiffs argue that the balance of equities and the public interest weigh in their favor because they have shown that they are likely to succeed on the merits, "they have certainly raised 'serious First Amendment questions' and the equities 'tip sharply' in their favor." Dkt. No. 5 at 29.

The District responds that the requested injunction is contrary to the public interest because it would "require that the District deviate from its policies and procedures, and apply different standards unique to LifeWise." Dkt. No. 21 at 26. This, in turn, "would negatively impact the day-to-day operations of the school, place additional administrative burdens on staff, . . . create confusion amongst students and families[,] . . . potentially negatively impact the educational services provided to other students, . . . undermine[] the public interest in local control of schools," "expose others to risk of harm," and "have the potential of negatively impacting the educational services provided to other students." *Id.* The District cites nothing in support of this list. Moreover, the injunction described in this Order does not treat LifeWise differently. Instead, it would allow LifeWise to attend the resource fair and distribute its flyers just as other entities do. And it would allow Ms. Sweeny's children to read LifeWise materials—including Bibles—during their free time, just as they can read other literature. Finally, allowing parents to give permission for an entire semester, instead of weekly, and for release to a few specified LifeWise personnel would alleviate

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 34

the burdens that have led to missed LifeWise classes, and seemingly would reduce the administrative burdens and confusion the District identifies without adding a risk to student safety.[9]

### III. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion for a preliminary injunction, Dkt. No. 5. The Court ORDERS that Defendant Everett School District must:

1. Permit LifeWise to participate in the District's community resource fairs;

2. Permit LifeWise to display printed flyers in schools of the District where and to the extent secular organizations are allowed to do so, including flyers with the photo of the boy praying;

3. Permit Emerson Elementary School students to be released for LifeWise programs with permission slips that (a) release custody of the students to no more than four specifically named individuals, and (b) allow parents to specify that the release applies on a semester-long basis for each specifically listed date and time during the semester that LifeWise offers its programs to Emerson Elementary School students; and

4. Permit Ms. Sweeny's children to read LifeWise reading materials during times of the school day during which students may read other non-scholastic materials.

Dated this 24th day of April, 2026.

Lauren King
United States District Judge

---

[9] *See, e.g.*, Dkt. No. 34-1 at 6 (a parent noting the unreliability of Emerson's email system, including the Secretary losing access to the system or failing to keep track of emailed permissions slips).

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR A PRELIMINARY INJUNCTION - 35